JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| IN RE: HOAG URGENT CARE-TUSTIN, INC. | CASE NO. SACV 19-2343-MWF<br><br>ORDER RE: CONSOLIDATED APPEAL FROM THE UNITED STATES BANKRUPTCY COURT'S ORDERS |

Before the Court is a consolidated appeal from the United States Bankruptcy Court (the Honorable Theodor C. Albert, United States District Judge). Appellants Robert Amster, Robert Amster, M.D., Inc., and Your Neighborhood Urgent Care, LLC ("YNUC") submitted their Opening Brief ("OB") on December 2, 2020. (Docket No. 35). Appellees Hoag Memorial Hospital Presbyterian ("Hoag Hospital") and Newport Healthcare Center, LLC ("Newport") submitted their answering brief ("AB") on December 29, 2020. (Docket No. 36). Appellants filed a reply brief ("RB") on January 26, 2021. (Docket No. 39). Appellants appeal three of the bankruptcy court's orders:

1. The Order Granting Defendants' Renewed Motion for Partial Summary Judgment (the "Joint Venture Order"), issued on November 19, 2019;

2. The Order Granting Counter Claimants' Motion for Partial Summary Judgment (the "Counterclaim Order"), issued on November 19, 2019;

1

      3.  The Order Granting Hoag Parties Motion to Strike Untimely Jury Demand (the "Jury Demand Order"), issued on October 11, 2019.

(*See* OB at 1). Appellants initially indicated that they intended to appeal a fourth order as well, the Judgment Approving Stipulation Re: Amount of Damages in Connection with Order Granting Counterclaimants' Motion for Partial Summary Judgment (the "Damages Judgment"), issued on February 21, 2021. (*See id.*). However, the Opening Brief made no arguments with respect to the Damages Judgment. (*See generally* OB). At the hearing, Appellants confirmed that they have abandoned this portion of their appeal. (Hearing Transcript ("Tr.") 27:15-22).

      The Court has read and considered the papers filed in this consolidated appeal, and held a telephonic hearing on February 12, 2021, pursuant to General Order 20-09 arising from the COVID-19 pandemic.

      For the reasons that follow, the Joint Venture Order and the Counterclaim Order are **AFFIRMED**. Because the Court affirms the Joint Venture Order and the Counterclaim Order, it need not reach the appeal of the Jury Demand Order.

## I.    BACKGROUND

###     A.    The Parties' Business Dealings

      In early to mid-2010, Appellants Dr. Robert Amster and YNUC, Dr. Amster's wholly-owned company, discussed a potential business arrangement with Appellee Hoag Hospital in which they would partner together to develop and operate up to five Hoag-branded urgent care centers in the area. (Appellants' Excerpts of Record ("Appellants' ER") at Vol. 3, pp. 509-511 (Docket No. 35-3)). Dr. Amster had expertise in and already owned and operated several urgent care centers in Orange County. (*Id.*).

      The parties initially discussed entering into a joint venture agreement whereby Hoag Hospital would own 51% and Dr. Amster would own 49% of an entity that would own and operate the urgent care centers. (Appellants' ER at Vol.

2

3, pp. 475, 480-488, 510, 520).  However, in June 2010, Hoag Hospital alerted Appellants that "the original JV wasn't feasible."  (Appellants' ER at Vol. 3, pp. 510, 520-22).  As a result, the parties pivoted to pursue an arrangement in which Appellees Hoag Hospital and Newport would lease real property and equipment to YNUC, loan funds to YNUC, and license the Hoag Hospital brand for use in connection with the urgent care centers' operations.  (Appellants' ER at Vol. 3, pp. 490-92, 496, 511).

On November 1, 2010, the parties' discussions culminated in the execution of the Master Urgent Care Development Agreement ("MUCDA").  (Appellants' ER, Vol. 2 at pp. 86-97 (Docket No. 35-2)).  Under the terms of the MUCDA, the urgent care clinics (the "Clinics") were to be 100% owned and operated by Dr. Amster and YNUC and were to use the Hoag Hospital brand name pursuant to a licensing agreement setting forth certain standards that the Clinics were required to meet.  (*Id.*).  In addition, Hoag Hospital loaned YNUC funds for opening and operating the Clinics and Newport leased real estate and equipment to YNUC pursuant to various subleases (the "Subleases").  (*Id.*).  Appellees had no share of the profits or liability for the losses incurred by the Clinics and YNUC's financial obligations to Appellees that were created by the licensing and sublease agreements were not contingent on the Clinics' financial success.  (*See generally id.*).

In connection with each of the Subleases, and as security for YNUC's monthly payment obligations, Dr. Amster and Amster, Inc. executed the following Guaranty of Sublease Agreements (collectively, the "Guaranties"), pursuant to which Dr. Amster and Amster, Inc. unconditionally guaranteed all of YNUC's payment and other obligations under each of the Subleases.  (Appellees' Excerpt of Record ("Appellees' ER") at Vol. 2, pp. 481-500 (Docket No. 37-2)).

On December 1, 2012, after YNUC had experienced financial difficulties and was unable to make the loan and rental payments to Hoag Hospital and Newport, the parties entered into certain loan and sublease restructuring agreements (the

"Restructuring Agreements"). (Appellants' ER at Vol. 2, pp. 77, 99-125 (Docket No. 37-1); *id.* at Vol. 3, pp. 535, 539-625). In the Restructuring Agreements, Dr. Amster and YNUC agreed and acknowledged that "Neither [Hoag Hospital / Newport], nor any of its present or former employees, officers, directors, or agents at any time has agreed or consented to being an agent, principal, participant, ***joint venturer***, partner or alter ego of YNUC." (Appellants' ER at Vol. 2, p. 108) (emphasis added); (*see also* Appellees' ER at Vol. 2, p. 535). Beginning in May 2017, Newport stopped receiving the required rent and equipment payments under the Subleases with YNUC. (Appellants' ER at Vol. 2, p. 75; *id.* at Vol. 3, p. 536; Appellees' ER at Vol. 2, p. 700).

### B. The Adversary Proceeding

On August 2, 2017, the HUC Debtors filed chapter 11 bankruptcy petitions. (Appellants' ER at Vol. 2, p. 75; Appellees' ER at Vol. 2, p. 700). On December 4, 2017, Appellants commenced the underlying adversary proceeding and filed their amended complaint on June 25, 2018. (Appellants' ER at Vol. 2, pp. 2-68; *id.* at Vol. 2, pp. 69-137; *id.* at Vol. 2, pp. 138-300). Appellants' amended complaint alleged that the parties were engaged in a joint venture, and that Appellees had breached fiduciary duties owed to Appellants as part of that alleged joint venture (the "Joint Venture Action"). (*Id.*). In turn, Appellees asserted counterclaims for breach of the Subleases and the Guaranties (the "Counterclaim Action"). (*Id.*). Appellants defended the Counterclaim Action by asserting that the Guaranties were invalid as "sham guaranties," and therefore unenforceable. (Appellants' ER at Vol. 18, p. 4342 (Docket No. 35-18)).

On April 15, 2019, Appellees moved for Partial Summary Judgment in the Counterclaim Action ("Counterclaim MSJ"). (Appellants' ER at Vol. 2, pp. 311-367). On September 12, 2019, Appellees filed their Renewed Motion for Partial

Summary Judgment on the Joint Venture Action (the "Joint Venture MSJ"). (Appellants' ER at Vol. 3, pp. 408-458).

On November 19, 2019, the bankruptcy court granted Appellees' Joint Venture MSJ and Counterclaim MSJ. (Appellants' ER at Vol. 18, pp. 4330-4332; *id.* at Vol. 17, pp. 4242-4269, 4333-4345) (Docket No. 35-17). In the Joint Venture Order, the bankruptcy court held that Appellees were entitled to summary judgment because there was "not a shred of evidence" that the parties co-owned or intended to co-own anything, an indispensable requirement of a joint venture. (Appellants' ER at Vol. 17, pp. 4254). In the Counterclaim Order, the bankruptcy court ruled that the Guaranties are enforceable and rejected Appellants' "sham guaranty" defense, holding that sham guaranties can only exist in the context of a real property foreclosure. (Appellants' ER at Vol. 18, pp. 4333-4345).

## II.  STANDARD OF REVIEW

The Court has jurisdiction to hear appeals from final judgments, orders, and decrees of the bankruptcy court. 28 U.S.C. § 158(a). When considering an appeal from the bankruptcy court, a district court uses the same standard of review that a circuit would use in reviewing a decision of a district court. *See In re Baroff*, 105 F.3d 439, 441 (9th Cir. 1997).

"A grant of summary judgment is reviewed de novo." *L.F. v. Lake Washington Sch. Dist. #414*, 947 F.3d 621, 625 (9th Cir. 2020) (citation omitted). A reviewing court must determine, "viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (citation omitted).

## III. DISCUSSION

### A. The Joint Venture Order

The bankruptcy court granted Appellees' motion for summary judgment on Appellants' breach of fiduciary duty claim, holding that Appellants had failed to show the existence of a fiduciary relationship as a matter of law. (Appellants' ER at Vol. 18, pp. 4330-4332; *id.* at Vol. 17, pp. 4242-4269). Appellants' claim rested on the theory that the parties were engaged in a joint venture which imposed fiduciary duties on Appellees. (*Id.*). Appellants contend that the bankruptcy court erred in determining that Appellants had failed to create a triable issue as to the existence of a joint venture. (OB at 22-29).

"A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit. Like partners, joint venturers are fiduciaries with a duty of disclosure and liability to account for profits." *Weiner v. Fleischman*, 54 Cal. 3d 476, 482, 286 Cal. Rptr. 40 (1991) (internal citations and quotation marks omitted). Generally, three elements show the existence of a joint venture: "(1) joint interest in a common business; (2) with an understanding to share profits and losses; and (3) a right to joint control." *Jacobs v. Locatelli*, 8 Cal. App. 5th 317, 328 n.10, 213 Cal. Rptr. 3d 514 (2017) (citation omitted).

A joint venture may be formed by express agreement or it "may be assumed as a reasonable deduction from the acts and declarations of the parties." *Scottsdale Ins. Co. v. Essex Ins. Co.*, 98 Cal. App. 4th 86, 91, 119 Cal. Rptr. 2d 62 (2002). Indeed, "the conduct of the parties may create a joint venture despite an express declaration to the contrary." *Apr. Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 820, 195 Cal. Rptr. 421 (1983) (citing *Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal. 2d 751, 765, 128 P.2d 665 (1942)). "[W]here evidence is in dispute, the existence or nonexistence of a joint venture is a question of fact to be determined by the jury." *Id.*

In granting summary judgment in favor of Appellees, the bankruptcy court held that co-ownership is an indispensable aspect of a joint venture and that there was "not a shred of evidence" in this case that the parties here co-owned anything. (Appellants' ER at 4254). Appellants do not dispute that, under the terms of the MUCDA, Appellees had no ownership rights in and did not explicitly share in the direct profits or losses of the Clinics. (OB at 29). Rather, Appellants assert that the bankruptcy court erred by adopting an excessively narrow and literal understanding of shared profits and losses in the context of a joint venture. (*Id.* at 28). Appellants contend that the parties intended to create a joint venture because they understood that the success or failure of the Clinics would impact both parties. (*Id.*)

While "[s]haring profits and losses in a common enterprise is usually an indispensable feature of a joint venture," "this strict approach has not always been followed, and similar cooperative contractual arrangements may be loosely termed joint ventures, or akin to them." 9 Witkin, *Summary of California Law* (11th Ed. 2020), Ch. XII Partnership § 14 Sharing of Profits and Losses (citing *Krantz v. BT Visual Images, L.L.C.*, 89 Cal. App. 4th 164, 177, 107 Cal. Rptr. 2d 209 (2001)).

For example, in *Krantz*, the appellate court reversed the trial court's grant of summary judgment in favor of the defendants on the plaintiff's breach of fiduciary duty claim, holding that triable issues existed as to the existence of a joint venture. 89 Cal. App. 4th at 178. The parties had entered into an agreement to sell custom video conferencing systems — which were designed by the plaintiff and composed of the defendants' parts — with the understanding that the plaintiff would receive a certain commission on any sales to a particular client. *Id.* at 168. The court acknowledged that the parties had not agreed to share profits and losses but determined that this fact did not foreclose the existence of a joint venture as a matter of law. *Id.* at 178. The court reasoned that

> [w]hile in a technical joint venture there is usually a sharing of profits and losses in prosecution of the common enterprise, the mode of

>participation in the fruits of the undertaking may be left to the agreement of parties; and whether they create the strict relation of joint adventurers or some other relation involving cooperative effort depends on their actual intention.

*Id.* at 177-78.  Although the defendants asserted that the parties were independent contractors under the terms of their agreement, the plaintiff created a triable issue by pointing to parole evidence suggesting that the parties' intent was to enter into a joint venture. *Id.* at 178.

It is worth noting that *Krantz*'s expansive approach to the typical requirement of sharing profits and losses is an outlier, as *Krantz* itself acknowledges.  *See* 89 Cal. App. 4th at 177-78 (stating that the "strict approach" of treating the sharing of profits and losses as an indispensable feature of a joint venture "has not always been followed").  However, even adopting *Krantz*'s atypical approach here, the success of Appellants' argument still depends on the existence of some evidence that the parties actually intended to create a joint venture.  *See id.* at 178.  Yet, the evidence in the record shows the opposite.  The parties initially contemplated joint ownership of the Clinics but later decided to pivot away from that arrangement after Appellees determined that a joint venture "wasn't feasible." (Appellants' ER at Vol. 3, Ex. 17, pp. 510 and 520-22; at Vol. 10, Ex. 50, pp. 2401:8-2402:14).  The parties instead opted to structure their business relationship to that of creditor/debtor, landlord/tenant, lessor/lessee, and licensor/licensee.  The fact that the parties entered into these legal arrangements after affirmatively rejecting a joint ownership structure indicates that Appellees intended to avoid the implications of a joint venture, that is, the responsibilities and risks — as well as the benefits and rewards — of co-owning and co-operating the Clinics with Appellants.  And although it is not determinative, *see Apr. Enterprises*, 147 Cal. App. 3d at 820, Appellants also signed an agreement with Appellees in which all parties expressly disclaimed any past or current intent to be joint venturers. (Appellants' ER at 108; Appellees' ER at 535).

Appellants point to evidence showing that Hoag intended to profit from the parties' relationship through (1) revenues from the financing of the Clinics; (2) revenue from patient referrals; (3) revenue from increased market share; and (4) revenue from expanding recognition of the Hoag brand. (OB at 28). Without more, these anticipated benefits fall far short of evincing Hoag's intent to create a joint venture with Appellants. Unlike the business arrangement in *Krantz* where the plaintiff was to receive a percentage of the revenue from each joint sale, Appellees were legally entitled to receive the exact same loan and rental payments from Appellants, regardless of the amount of revenue the Clinics generated (or failed to generate). As the bankruptcy court reasoned, it cannot be the case that a joint venture is established whenever two entities intend to make a mutually beneficial business deal; such a rule would have "no limiting principle," creating putative joint ventures for a wide range of standard contractual agreements. (Appellants' ER at 4251). The Court agrees with the bankruptcy court that there is simply no evidence from which a reasonable trier of fact could conclude that the parties intended to create a joint venture.

The bankruptcy court's Joint Venture Order is **AFFIRMED**.

B.     **The Counterclaim Order**

Appellants do not dispute that Dr. Amster and Amster, Inc. executed the Guaranties, unconditionally guarantying all of YNUC's monthly payments and other obligations under each of the Subleases. (*See* OB at 30-32). Rather, Appellants contend that the Guaranties are unenforceable "sham guaranties." (OB at 30-32). Appellants made this same argument below, which the bankruptcy court rejected after determining that the "sham guaranty" defense does not exist outside of the context of a real property foreclosure. (*Id.* at 30). Appellants contend that the bankruptcy court erred in rejecting their sham guaranty defense and granting

summary judgment in favor of Appellees on Appellees' breach of guaranty claim. (*Id.*).

"A lender is entitled to judgment on a breach of guaranty claim based upon undisputed evidence that (1) there is a valid guaranty, (2) the borrower has defaulted, and (3) the guarantor failed to perform under the guaranty." *Gray1 CPB, LLC v. Kolokotronis*, 202 Cal. App. 4th 480, 486, 135 Cal. Rptr. 3d 448 (2011).

"A lender may not obtain a deficiency judgment on a guaranty that is shown to be a sham." *LSREF2 Clover Prop. 4, LLC v. Festival Retail Fund 1, LP*, 3 Cal. App. 5th 1067, 1075, 208 Cal. Rptr. 3d 200 (2016). "In determining whether a guaranty is a sham, the court examines whether the guarantor is actually the principal obligor, which occurs when . . . the guarantor is, in reality, the principal obligor under a different name by operation of trust or corporate law or some other applicable legal principle." *Id.* (citation omitted). "The court's overall focus when examining whether guaranties are shams is to look to the purpose and effect of the parties' agreement to determine whether the guaranties constitute an attempt to circumvent the antideficiency law and recover deficiency judgments when those judgments otherwise would be prohibited." *Id.* (citation omitted).

California "courts have repeatedly recognized that the antideficiency laws embodied in [Code of Civil Procedure] sections 580a through 580d and 726 reflect a legislative policy that strictly limits the right to recover deficiency judgments for the amount the debt exceeds the value of the ***security***." *Cadle Co. II v. Harvey*, 83 Cal. App. 4th 927, 932, 100 Cal. Rptr. 2d 150 (2000) (emphasis added). These laws were created to "prevent an overvaluation of the security," "prevent the aggravation of an economic recession which would result if creditors lost their property and were also burdened with personal liability," and "prevent the creditor from making an unreasonably low bid at the foreclosure sale, acquire the asset below its value, and also recover a personal judgment against the debtor." *Torrey Pines Bank v. Hoffman*, 231 Cal. App. 3d 308, 318, 282 Cal. Rptr. 354 (1991) (quoting 4 Miller &

Starr, Cal. Real Estate (2d ed. 1989) § 9:156 at 524-25) (internal quotation marks omitted).

During the hearing, Appellants conceded that they had not identified a single California case applying the sham guaranty defense outside of the context of real property. (Tr. 27:1-14). Given the lack of case law supporting Appellants' position, as well as the policy reasons underlying the antideficiency laws and the sham guaranty defense, the Court agrees with the bankruptcy court that the sham guaranty defense is not applicable here, where the Guaranties involved obligations wholly unrelated to foreclosure of real property.

Accordingly, the Counterclaim Order is **AFFIRMED**.

### C. The Jury Demand Order

Appellants contend that the bankruptcy court erred in denying their demand to have the joint venture and breach of guaranty issues determined by a jury, asserting that (1) their demand was timely under Federal Rule of Civil Procedure 38, and (2) even if it were not timely, the bankruptcy court should have exercised its discretion under Rule 39 to allow a jury trial on all issues. (OB at 32-37).

Because the Court affirms the orders granting summary judgment against Appellants in the Joint Venture and Counterclaim Actions, the Court does not reach the issue of whether the bankruptcy court erred in issuing the Jury Demand Order.

## IV. CONCLUSION

The Joint Venture Order and Counterclaim Order and the Judgments are **AFFIRMED**. Accordingly, the Court does not reach the appeal of the Jury Demand Order.

IT IS SO ORDERED.

DATED: March 30, 2021

MICHAEL W. FITZGERALD
United States District Judge

CC: Bankruptcy Court